ELLIS, Judge.
On March 5, 1964, plaintiff filed suit in tort alleging that the defendant, Robert A. Brantley, driving a truck belonging to the defendant, Magnolia Transportation Company, Inc., and insured by The Travelers Insurance Company, willfully and intentionally attempted to run plaintiff down by turning his truck abruptly to the left in plaintiff’s direction, striking him on the right arm and causing certain injuries to him. The case was duly tried and, for written reasons assigned, judgment was rendered in favor of the defendants, dismissing the plaintiff’s demands at his cost. These reasons are brief and we quote:
“This is an action for damages for personal injuries.
“Plaintiff would have the Court to believe that Brantley delibertately drove his heavy truck directly at Holden in order and with the intent to injure him.
“There was a strike at the plant of the Atlantic Refining Co. and a picket line had been established. Holden was helping to maintain the line on the day of his accident. Brantley drove his truck loaded with pipe through the line. He was driving his truck back to the public road where the pickets were when Holden walked toward the truck. He says he raised his hand in an effort to stop Brantley so that he could talk to him.
“Brantley said that he did not hear what, if anything, Holden said. At any rate, he knew very well that Holden did not intend to bid the time of day. It looked to him as if Holden was trying to jump *350 onto his truck, and was reaching for the iron triangle which upholds the rear-view mirror.
"Brantley did what any reasonable man would have done under similar circumstances. He simply drove on and Holden missed the hold and fell onto the ground.
“This is a question of fact, and I believe that the law and the facts are against plaintiff. I believe that he has failed to prove that Brantley tried to run over him.
“For these reasons, judgment will be signed dismissing plaintiff’s demand at his cost.”
From this adverse judgment the plaintiff has appealed and assigned the following specifications of error as set forth in brief filed on his behalf, to wit:
“1.
“The Lower Court erred by holding that the defendant, Robert A. Brantley, did not wilfully and intentionally maneuver his truck so as to strike appellant.
2.
In the alternative, the Lower Court erred in holding that the defendant, Robert A. Brantley, did not negligently strike appellant with defendant’s truck.
3.
The Lower Court erred in dismissing appellant’s suit.
4.
The Lower Court erred in not awarding appellant damages in the amount of $2,500.00.”
The specifications of errors 3 and 4 are, of course, dependent upon the court finding from the facts that Brantley, the driver of the truck, did willfully and intentionally maneuver his truck so as to strike appellant or, alternatively, that Brantley did negligently strike the appellant with defendant’s truck and therefore a discussion of the facts which would be decisive of the specifications of errors 1 and 2 is of primary importance.
On September 11, 1963, Brantley was driving a tractor-trailer truck, 45 feet in overall length, loaded with fabricated pipe of various sizes to be delivered to the Atlantic Refining Company plant for the Dressier Engineering job. This plant was located near the Town of Franklin, Louisiana, in St. Mary Parish, on the Bayou Sale Road, which was 20 feet in width, and when Brantley entered the plant it necessitated a right turn in order to enter the private driveway which was perpendicular to the main highway (Bayou Sale Road), across a culvert located approximately three feet from the edge of the pavement and which had been placed in the ditch at approximately the entrance to the private driveway, and thence through the gate into the plant. From the gate to the main highway was approximately twelve or fifteen feet. Before entering the plant, Brantley had stopped at the entrance and had gotten directions from Ralph Foster, who was the armed guard stationed at the gate in the employ of Dressier Engineering Corporation. At this time he saw four or five pickets across the road in the shade of a tree. The record shows that there were four pickets and the plaintiff who at that time was the business representative of the Plumbers and Steamfitters and Pipefitters Local of Baton Rouge No. 198, who was in charge of the pickets and had, under instructions from the union, placed a picket line on that job. At that time neither the plaintiff nor any of the pickets came to the track or made any attempt to say anything to Brantley.
Brantley drove his truck into the plant and while it was in the process of unloading Thibodeaux, one of the pickets, and the plaintiff wished td inquire of Brantley whether there was a uhion label on the pipe and if it was fabricated in a union shop. The plant was enclosed by a fence and they walked a short distance along this highway *351 to a part opposite the location in which the track was being unloaded and Brantley was talking to someone nearby. They stated that Brantley was looking in their direction when they attempted to question him or get his attention so as to obtain the' information they desired but that he turned his back to them and apparently did not hear them. We are given the impression that Brantley really saw these men and was aware that they were directing their talk to him and deliberately turned his back. Be that as it may, Thibodeaux and plaintiff returned to the gate and asked the guard, Foster, if they could speak to Brantley when he came out of the gate and were told by Foster that he had no authority to give or deny such permission but “If you want to talk to the man, go ahead.”
When the unloading of the truck was completed, Brantley backed it around, placed it in low gear and proceeded at approximately five miles per hour toward the entrance gate intending to turn left on the highway. When he reached the gate at the entrance to the plant, the version of what happened thereafter is conflicting among the witnesses. As to what happened while the truck was being driven from the gate to the highway, some fifteen to eighteen feet, and its left turn onto the highway, we have the testimony of Brant-ley, the driver of the truck; Foster, the armed guard, who was also a sworn deputy sheriff for the Parish of St. Mary; and two pickets, Thibodeaux and Blanchard, as well as the testimony of the plaintiff.
Brantley testified that when he started out the gate there was a picket walking across “in front of me”. He had a sign and he walked on across and Brantley started out the gate which he estimated to be twelve or fifteen feet or slightly less from the paved surface of the public highway. He also estimated that he was within six or eight feet of the culvert that had been placed in the ditch for vehicles to cross and which was within three or four feet of the highway. He continued at five miles an hour and when the front wheels or the front end of his truck “was coming on to the road” he first saw the plaintiff running toward the truck and when asked what this man did he stated, “he run close to the door. Now, whether he touched the truck, I don’t know, because I saw him in my mirror and the truck didn’t touch him.” He then qualified this statement by testifying, “Unless— the only thing that might have caught— he might have reached up to try to catch that mirror arm to get on the running board but he never did get on the running board.” Brantley further testified, when asked whether he was headed at right angles into the road or whether he cut at an angle to the road when he saw plaintiff coming toward him:
“A. No, I was coming at an angle because they had a turn there. I was coming at — I guess you would say a forty-five.
Q. You were making a left turn?
A. Yes.
Q. And you were cut at about a forty-five between your cab and your trailer?
A. Well, the complete unit because I came out of the plant at an angle.
******
Q. Well, were your cab and your trailer in a straight line?
A. Well, very near straight.
Q. But you had to swing to your left in order to make this left turn to get on the highway, didn’t you?
A. That’s right.”
Brantley' estimated that plaintiff might have gotten within three feet of his cab or it might have been two feet and that he really did not know whether he got close enough to reach for that mirror arm or not so as to catch it. He did not think when he saw the plaintiff running toward the truck that he was coming over to talk to him and he did not know what he was coming for as he never said a word to *352 Brantley although his windows were open ■and he believed he would have heard him •or seen his lips moving if he had said anything to him. When asked what he did when he saw the plaintiff coming toward his truck, he stated that he just continued •on, accelerated his speed by pushing the •gas pedal all the way down, and the speed in low gear would be limited to ten miles an hour, and he also denied that he swung abruptly to the left. Additionally, when asked if the rear dual tandem wheel of the trailer left the edge of the culvert as he made his left turn, he testified, “It would have had to regardless. It would have had to come off some because it was an awful long trailer.” He never did see the plaintiff after he passed him. He was further ■questioned if he had any reason to believe that any act of violence was about to be •committed upon him and he answered, '“Well, usually in something like that, anything comes up, violence does happen.” He was also asked why he didn’t stop his truck to see what the man wanted who was running toward his truck, and he answered, “Well, just the reason I didn’t want — I have seen places where they have beat men ■up for going into places.”
The testimony of Ralph Foster, the guard •at the gate and a deputy sheriff of St. Mary Parish, was to the effect that as the truck pulled up to the gate before it had ■come onto the highway, the plaintiff had ■crossed the driveway on the right-hand side •of the truck and the truck had pulled out to the road at a slow speed. “ * * * it seems I saw Mr. Holden, it seems like he was walking over to the truck and was going to get on the running board. Well, at that time the truck took off at a high rate of speed to come out of a driveway.” He further testified that he did not see the truck hit Holden but when it had passed he was “laying over in the ditch.” Foster immediately went over to where Holden had fallen in the ditch and the latter was up looking for his glasses and “hollering, ‘Stop that truck. Stop that truck. Did you see that truck hit me.’ ” Foster testified that he was not in a position to know whether plaintiff said anything to the truck driver or not but that he did not see any move which plaintiff made toward the truck or the truck driver which could have been interpreted as hostile.
This witness was also questioned as to whether he saw any signs on plaintiff that he had been hit and he answered that his coat was dirty and when he asked which side of his coat, he answered, “I don’t remember which arm it was.”
Russell Thibodeaux testified that as the truck was coming out he walked across the main highway and that plaintiff walked up to “the corner” (not identified) and was standing there waiting for the driver to come out and when he did get close to the plaintiff the latter asked him if he could speak to him. Brantley just kept coming on out and, if he heard, paid no attention, but he did increase his speed. Thibodeaux, when asked if Brantley kept going in the same direction or if he changed his direction as he entered the highway, stated, “Well, he had to turn to the left a little in order to get his truck onto the highway.” After the truck passed, he saw the plaintiff getting up out of the ditch. Just prior to getting hit, this witness testified positively, the plaintiff was standing still near the end of the culvert which had been located by other testimony as being approximately three feet from the end of the blacktop.
The witness, Junius Blanchard, testified that as the truck came out plaintiff was standing near the side of the bridge (culvert) and that he was approximately ten feet back of him alongside the ditch and when the plaintiff raised his hand and told the driver, “I want to talk to you” it was then that Brantley speeded up his truck and cut “hard” to his left and the trailer about half-way back, or midlength of the trailer, struck the plaintiff “on the right shoulder and throwed him fifteen feet in the ditch.”
*353 The plaintiff testified that as the truck came toward the gate entrance he walked across to the north side of the exit to the plant and stood with one foot on the culvert which protruded “out past the dirt I would say maybe eight or ten inches” and one foot on the shoulder of the road, and he explained that this culvert was about eighteen inches from this shoulder. Plaintiff was standing in this position at the time the truck driver came out of the entrance gate. His testimony as to what actually happened is as follows:
“A. Yes. I was in that position and the truck proceeded at about five miles an hour and he could have checked his speed slightly. I don’t remember whether the picket was crossing the road or not, I heard in some of the testimony that the picket was crossing — I don’t remember. But I did — you would raise your hand to speak to somebody, Your Honor, I did raise my hand and state T would like to speak with you, I would like to talk to you.’ And when I said that, the truck driver glanced down at me and speeded the truck up and cut the truck sharply to the left in the position where I was standing. Then I saw that the trailer and truck was going to cross somewhere near • where I was standing and I turned to move, to get out of the way, and as I turned to move, the trailer body hit my shoulder and I fell in a running, sprawling position in the ditch, stumbling. — kind of in a stumbling position and on my hands and knees, but I didn’t know that I had lost my glasses until I got up, the ■ impact had knocked my glasses off, and one of the picket-walkers, I don’t know whether it was Thibodeaux or who it was, one of them picked my glasses up, they found them — I was looking for them. Then about that time, Mr. Foster came over and I said, ‘How about calling the Sheriff’s Office. ■ I would like to have this man arrested. He tried to run over me.’
Q. Now, why do you say he tried to run over you ?
A. He cut real sharp and the trailer, tanden wheels of the trailer missed the culvert, they run off the culvert, missed the culvert at least three to four feet. The trailer wheels run into the ditch.
Q. You say the man was looking at you when he cut the truck?
A. Yes, he looked down at me when I raised my hands. I guess that’s why he might have stated that I might have been reaching up for the mirror of the truck — I heard someone say something to that effect.
Q. Did you reach for the mirror on the truck ?
A. No, I raised my hands to more or less attract his attention, like you would anybody across the street or someone walking by, you could just raise your hands.
Q. Did you jump back and fall?
A. No. I turned to move out of the way of the truck and just as I turned, he had speeded up, and the tandem trailer bed struck my right arm just below the shoulder.”
We cannot agree that the testimony proves the plaintiff was attempting to get on the running board of the truck by grabbing hold of the extension arm on the mirror. To the contrary, it proves that the plaintiff raised his hand and arm as a signal for Brantley to stop the truck in conjunction with such a verbal request. We believe this for the reason that Brant-ley only testified he thought plaintiff “might have reached up to try to catch that mirror arm to get on the running board but he never did get on the running board.” Brantley further testified that the plaintiff “may have got within three feet of it or it might have been two feet. I don’t know whether he got close enough to reach for that mirror arm or not, to reach and catch it.” The distance referred to ■in this testimony is in response to a question as to how close plaintiff got to the cab. It must be remembered, also, that Brantley *354 was sitting four to five feet above the ground in his cab with the window open and slightly to the rear of the arm of the mirror and he was also looking at the plaintiff when he raised his arm and hand and testified he continued to do so in his rearview mirror after the cab passed plaintiff and he never 'did see him again. If plaintiff had reached for his mirror arm, grabbed it and lost his hold, or even intended to grasp the mirror arm, Brantley would have testified positively rather than “he might have”. Further, there is no reason revealed in the testimony in this case for plaintiff to have wished anything more than to talk briefly to Brantley. There had been no violence, there was no violence at the time and no evidence in this record of any intention to commit any violence. We are convinced that plaintiffs testimony as to his actions as the truck approached him is entirely consistent with his expressed intention. He wished to get some information with regard to the union label on the pipe which was in line with his union duties.
Neither do we believe that plaintiff has proven that Brantley willfully, etc., intended to “run plaintiff down.” On the contrary, we are of the opinion that Brantley became unduly — without reason — alarmed and doubled the speed of his truck and was henceforth intent upon leaving the scene with all speed and in utter disregard to plaintiff’s position with one foot resting on the end of the exposed metal culvert, which was not in the driveway proper as the culvert was covered with dirt the width of the driveway that was to be used by trucks and other vehicles going in and out of the plant, and with the other foot near the edge of the blacktop. No one except Brantley testified that the rear wheels of his trailer of necessity had to run off of the left end of this culvert and three to four feet distance from the end in order for him to make the left turn onto the blacktop highway. This driveway is the entrance to a manufacturing plant and we presume, without testimony to the contrary, that it was built sufficiently wide for all motor vehicles expected to enter the plant which might be necessary and incidental to its business. There is not one line of testimony that this truck did not enter this plant without running off of this culvert. There was no duty upon the truck driver to stop but he owed a duty — the duty of care in the operation of this truck — to the plaintiff whom he saw before he got to the road, standing to the side of the driveway in a safe position had Brantley operated his truck properly. Unless he had steered his truck more to the left than was necessary, the rear end would not have gone three to four feet off of the left end of the culvert. Even if plaintiff had been in a dangerous position, Brantley could have seen him for more than a sufficient distance at five miles an hour to have stopped the truck. We venture to say that had there been a railing across the ditch at the end of the culvert, a telephone pole or some other obstacle in the exact position that the plaintiff was in at the time Brantley approached it in order to enter the highway and turn left he would never have struck it.
It is further argued that the truck did not strike the plaintiff. However, we believe the latter’s story to be reasonable under the facts and that when he realized that the rear portion of the truck would run over him if he stayed where he was due to the unduly sharp left turn made by Brantley, he turned to get out of the way and was struck on the right shoulder with sufficient force to cause him to stumble and fall some distance from the culvert. But, assuming for the sake of argument that the truck did not make contact with him, his fall and injury were due to the negligence of Brantley as it came about either by being struck or in an effort by the plaintiff to avoid being run over by the rear end of this -truck. He testified that he realized he could not stand in his position and was attempting to get out of the way. It is most fortunate that he didn’t fall at the end of the culvert as he was within *355 three to four feet of where the rear wheels passed.
We are of the opinion that the plaintiff’s damages are relatively minor and in no wise serious. This accident occurred on the 11th day of September 1963 and on the same day he saw Dr. Fernandez at about 4:00 or 5:00 P.M., which was approximately an hour and a half after the occurrence, and his complaints at that time were that he was struck on the right arm by a truck. Dr. Fernandez made a physical examination and found black and blue marks, contusions and muscle soreness with no limitation of the normal expanse of the motion of the joints above or below the site of the injury. He was asked if the bruises were minor or severe, and he stated it was difficult to answer that since “you are referring it to the bruise. If I could qualify it, I would say that I did not feel that his injuries were severe.” He felt from the clinical examination that plaintiff had no fractures or dislocations and that in a reasonable length of time, a period of two to three weeks, he would be completely without pain or disability. He only saw plaintiff on that one occasion. He did state, however, that in the next day or so plaintiff would probably have a lot more severe pain on motion and he prescribed medication for the relief of pain and muscle spasm. This doctor also testified that in his opinion the force of impact depends upon many factors, particularly speed, relative speed between the two objects that are meeting and “I couldn’t say that in this instance there was much speed involved. It might have been a matter of balance or positions.”
Dr. McVea of Baton Rouge examined the plaintiff in December, approximately three months after the accident, and by agreement his findings and conclusions have been introduced in the form of a letter. At that time the plaintiff complained that he had suffered some distress in his neck, but that it had cleared up satisfactorily and gave him no trouble but that he still had soreness in the right shoulder and arm which manifested itself to a greater degree when he raised his arm to shoulder level or higher. Dr. McVea stated in the letter that there were no other significant complaints at the time he examined him concerning the accident. He found an old fracture of plaintiff’s right shoulder which had occurred a number of years ago and which had healed without disturbance or disability and since that time he had had a small muscle hernia over the right shoulder which had not been disturbed by the accident. Dr. McVea’s examination was confined to the head, neck and upper extremities. He stated that there were no significant findings which could be related to the accident found in his examination of the head and neck. There was no difference in the size- of the arms and no evidence of any contusion at that time. There were no abnormal reflexes in either of the upper extremities but there was some hesitation in lifting the right arm above the head as if “there is discomfort in the right arm at the shoulder.” His final diagnosis was old contusion of right arm and shoulder, with the statement that plaintiff would not have any permanent disability from the injury but he did have some minor discomfort in the use of his right arm at the shoulder as a result of the injuries he sustained and that this discomfort would gradually disappear so that in a period of another six weeks he believed that 'he would have no residual effects of the accident.
The record also reveals that immediately after the accident he made no complaint as to any pain but was very excited and was intent upon having the sheriff or deputy arrest Brantley as he believed that he had deliberately intended to run him down. We believe this explained also by the nature of his injuries which would not manifest great pain immediately but he did go to see a doctor with it within two hours after the occurrence and there was definite evidence of injury which apparently was not serious.
*356 Considering all of the facts, we believe an award of $500.00 would be proper in this case.
Reversed and rendered.